# MOTION TO TERMINATE PROBATION

Submitted by Theodore Jay Sabot
Case No. 04-30017.UA
23 Walden Lane
Pittsfield, MA 01201

TO: Clerk's Office
U.S. District Court
1550 Main St.
Springfield, MA 01103   (tel.- 413-785-0215)

CC: Rachelle Lee
Federal Probation Office - Room 212
1550 Main St.
Springfield, MA 01103

---

Your Honor:

   I respectfully request that my Federal Probation (supervised release) be terminated earlier than the originally imposed sentence of three (3) years.✱

   In early 2003, when I pled guilty to one count of Health Care Fraud, the Hon. David N. Hurd, as part of the total sentence, placed me on three years of supervised release, to begin after a 4-month incarceration. Probation started in early July, 2003.
   I believe I have observed all the conditions of probation, such as paying the fine ($5,000), the

---

✱ I apologize for printing, but I type poorly.

restitution ($2,211.33) and the $100 court assessment.

As part of the plea agreement signed on August 14, 2002, it stated, on page 2, that "...the Court may also...modify, reduce ...the conditions of such release." [Addendum 1]

The purposes of supervised release are:

① to punish me,

② to protect society from further damage by my actions that led to this conviction,

and, ③ to prevent me from repeating the illegal behavior that resulted in this sentence.

As for number ③: as a consequence of my guilty plea, my professional practice has virtually disappeared; no agency will hire me or offer me a contract to provide psychiatric services, since I cannot participate in Medicare or Medicaid.

Further limiting my professional options is the fact that I can no longer practice medicine in California (I have only been licensed in California and New York). About one year ago, I agreed to surrender my California license. [Addendum 2]

Moreover, New York has put me on ten years' probation, which includes close supervision, by an approved physician monitor, of any professional activities involving the generation of billings. [Addendum 3] This includes the physician monitor having access to

records and bills regarding any patients.

Thus, it would seem that New York has put me on an even more stringent supervision program than Federal probation and for a longer period. This would satisfy the need to prevent further recurrence of the health care fraud that led to my conviction. (Even more significant, the pain, humiliation and loss — which words are inadequate to describe — that I have experienced has made it extremely unlikely that I would ever want to go through this again.)

The developments just outlined also satisfy the need to protect society from further damage from health care fraud by me. In fact, other than social security benefits, my main income is now provided by a small vending business started around October, 2003.

As for the Court's wish to punish me, well, that's understandable and expected. But, unfortunately, it's not the only suffering and punishment I have undergone since my 2003 sentencing. Additional grief, unforeseen by the sentencing judge, has been caused by governmental action. For this the staff at Federal Prison Camp Seymour Johnson must be given credit. Permit me to explain.

Before my incarceration in March, 2003 I was told to bring copies of my medical records in order to allow for continuity of any current treatment. When I arrived at FPC Seymour Johnson, I provided these, especially a report by my cardiologist. Yet, though I arrived there on March 11th, I was

given no medication until over a week later. Any cardiologist can tell you that, given what I was taking, this could have serious, if not fatal, consequences.

When I was finally given medication, significant changes were made (even though I had been on the same effective regimen for quite a while). I verbally complained several times, but did not learn until several weeks later to put my complaints in writing [see addenda 4-6]. Despite telling the medical staff of the (new to me) side-effects of the medication changes, nothing was done until after March 29, 2003, when I had the first episode of sudden loss of consciousness (the first time in my life). During a Saturday morning count, I keeled over backwards, striking my head on the hard concrete floor. [See addenda 4-7 for details of my symptoms and complaints which I tried to convey to the facility physician and the administration.]

Essentially, nothing really changed from March 29th until early June, 2003, despite continuing significant side-effects.

Then, on June 2, 2003, I again passed out, this time, unfortunately, on my face, suffering a deep gash in my lower lip, as well as cracking two upper front teeth. Bleeding profusely, I was eventually taken to the emergency room at Lenoir Memorial Hospital in Kinston, North Carolina. There, a Dr. Sotelo sutured my lip. After getting lab tests (I had told him that I thought a drop in my blood pressure had caused me to pass out), he diagnosed acute renal (kidney) failure and hospitalized me.

I remained there until June 4th. (Never before had I experienced kidney problems, much less kidney failure*.) While there, he indicated I would (finally) see a cardiologist, but I did not see one until June 11th, 5 days after the warden transferred me to the Federal Medical Center at Butner, North Carolina. (This happened shortly after I returned to the FPC.)

While at the Kinston hospital, a number of tests were done and the doctors concluded that the kidney failure was caused by the new medications I had been put on (a consulting kidney specialist from Duke, who saw me at Butner, agreed with this).

On June 5th, while resting after my return to the FPC, I was precipitously - and energetically - transferred to FMC Butner. When I asked, at the time, for an explanation for this, none was given. I had previously, on May 15, 2003, written to the warden requesting to see a cardiologist, but did not receive a response (though it was dated Sunday, June 8th) until June 26th, 3 weeks after I arrived at Butner [see addenda 6 and 7].

I will spare the Court further details of the abysmal treatment given me by the staff at FPC Seymour Johnson [see addenda 4-7].

On June 25, 2003, at Butner, I saw a consulting neurologist from Duke (several weeks earlier, I had asked to see a neurologist because of increasing difficulties with my gait - also a

---

* This was only one of several medical firsts for me, for which I am indebted to the Bureau of Prisons.

problem that was new to me). Among my symptoms he noted leg clonus (a sort of involuntary leg contraction — also a first for me) and told me I had signs of cervical spinal cord pressure and should seek further evaluation as soon as I was released (he knew I was going home in about 2 weeks).

The aftermath of my 4-month prison punishment:

Eye: Two emergency operations (July 25 and July 27, 2003) for a detached right retina, with a third operation in May, 2004 for a cataract in that eye, a not unusual sequelae of the first two operations. [see addendum 8].

Teeth: On July 15, 2003, my dentist [see addendum 9] attempted to repair the two broken front teeth. He did a fine job but still shudders when he sees all the small fracture lines in the teeth and recommends more elaborate reconstruction — which I have, so far, avoided, though I did need root canal work in the late summer of 2004.

Neck and Back: After seeing my own neurologist back home and having extensive tests, including several complex MRI studies, on January 14, 2004, I had surgery on my neck at the Albany Medical Center. This was required because of significant (over 50%) spinal cord compression, caused by cervical disc herniation.

The disc between vertebrae 3 and 4 was removed and the cervical spine below that was fused [see addendum 10].

As some pain and nerve loss has persited, I recently had a series of spinal injections, done at Albany Memorial Hospital, intended to lessen these continuing symptoms.

My vision has not been the best since; it never will be again. I can walk well, again, most days, but biting down on an apple with my front teeth remains a risky business.

I have had more physician visits and more operations in the last two years than in my previous six decades.

It is also, unfortunately, clear, from all the new symptoms I have developed, especially after the second episode of passing out on June 2, 2003 (which resulted in the first hospitalization I have needed since my tonsils were removed some time ago), that my subsequent medical problems and procedures were significantly, if not completely, precipitated by the negligence of the medical and custodial staff at FPC Seymour Johnson.

Sadly, the Bureau of Prisons is more concerned with paper than people, though they were quite proficient in meting out punishment. From what I have endured as a result of their tender mercies, I strongly believe I have suffered more than was necessary and I would think, more than Judge Hurd had intended for me.

Trusting that this Court has more concern for people than for paper or procedure, I request that my supervised release be terminated now.

Respectfully submitted,

*Theodore J. Sabot*

Theodore J. Sabot

April 29, 2005

ADDENDUM 1

AUG 14 2002
LAWRENCE K BAERMAN CLERK
ALBANY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

v.

THEODORE SABOT,

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Criminal Action No.
02-CR- 303

PLEA AGREEMENT

Hon.
U.S. District Judge

JOSEPH A. PAVONE, United States Attorney for the Northern District of New York, William C. Pericak, Assistant U.S. Attorney, and THEODORE SABOT ("defendant"), with Lee Greenstein, Esq., appearing, hereby enter into the following Plea Agreement regarding the disposition of certain criminal charges against the Defendant:

1. In return for the consideration described below, defendant agrees as follows:

   a. The Defendant will enter a plea of "Guilty" to a one count Information charging him with executing a scheme or artifice to defraud a health care benefit program in violation of 18 U.S.C. § 1347 and 2.

2. **Potential Penalties.** Defendant understands and acknowledges that his guilty plea to 18 U.S.C. § 1347 & 2 will subject him to the following potential penalties:

Docket No. C-03-680
I.G. Exhibit 5
Page 1 of 8

a. <u>Maximum term of imprisonment</u>: Ten (10) years.

b. <u>Mandatory minimum term of imprisonment</u>: None.

c. <u>Supervised Release</u>: In addition to imposing any other penalty, the sentencing Court may require the Defendant to serve a term of supervised release of up to three (3) years, to begin at the expiration of any term of imprisonment imposed upon him. (18 U.S.C. § 3583). Should the Defendant be placed on a term of supervised release and subsequently violate any of the terms and conditions of that release before the expiration of such term, he may be sentenced to up to two (2) years imprisonment in addition to any prison term previously imposed upon him and in addition to the statutory maximum term of imprisonment set forth above. Under some circumstances, the Court may also extend the term of supervised release, and it may modify, reduce, or enlarge the conditions of such release.

d. <u>Maximum fine</u>: Two Hundred and fifty thousand dollars ($250,000).

e. <u>Special Assessment</u>: The Defendant will be required to pay an assessment of $100.00, which is due and payable at or before the time of sentencing. (18 U.S.C. § 3013) The Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100.00, payable to the U.S. District Court at the time of his guilty plea.

2


a promise of any particular sentence and is not binding on the Court. The Defendant agrees that, should the sentence imposed exceed six (6) months, this would not permit him to withdraw his guilty plea, but would merely allow the Defendant to appeal the sentence imposed by the Court, to the extent permitted by 18 U.S.C. § 3742.

11. No promises, agreements or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless memorialized in writing and signed by all parties. This Agreement, to become effective, must be signed by all of the parties listed below.

JOSEPH A. PAVONE
United States Attorney
Northern District of New York

Dated: 8/14 , 2002    By: _____
William C. Pericak
Assistant U.S. Attorney
Bar Roll No. 102352

Dated: 8/14 , 2002    _____
Theodore Sabot
Defendant

Dated: 8/14 , 2002    _____
Lee Greenstein, Esq.
Attorney for Defendant
Bar Roll No.

8

National Practitioner Data Bank — Case 0017-UA    Document 3    Filed 05/02/2005    Page 12 of 20
Healthcare Integrity and Protection Data Bank
P.O. Box 10832
Chantilly, VA 20153-0832

(APP. 2)

http://www.npdb-hipdb.com

DCN: 5500000034583228
Process Date: 08/17/2004
Page: 1 of 3

# ADVERSE ACTION REPORT
## STATE LICENSURE ACTION

**Report Number** 5500000034583228

**This report is maintained in:** [X] The National Practitioner Data Bank

[ ] The Healthcare Integrity and Protection Data Bank

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. For additional information or clarification, contact the reporting entity identified in Section A.

### A. REPORTING ENTITY

| | |
|---|---|
| Entity Name: | MEDICAL BOARD OF CALIFORNIA |
| Address: | 1428 HOWE AVENUE SUITE 56 |
| City, State, ZIP: | SACRAMENTO, CA 95825-3236 |
| Entity Internal Report Reference (e.g., claim number): | |
| Name or Office: | PAM THOMAS |
| Title or Department: | LICENSING PROGRAM |
| Telephone: | (916)263-2365 |
| Type of Report: | REVISION TO ACTION |
| Related Report Number: | 0119930970110000 |

### B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)

| | |
|---|---|
| Subject Name: | SABOT, THEODORE J. |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 08/29/1938 |
| Home Address: | |
| City, State, ZIP: | |
| Country: | |
| Organization Name: | |
| Work Address: | 23 WALDEN LANE |
| City, State, ZIP: | PITTSFIELD, MA  01201 |
| Country: | |
| Organization Type: | |
| Other, as Specified: | |
| Deceased: | NO |
| Date of Death: | |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | 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 |
| National Provider Identifiers (NPI): | |

CONFIDENTIAL DOCUMENT – FOR AUTHORIZED USE ONLY

National Practitioner Data Bank
Healthcare Integrity and Protection Data Bank
P.O. Box 10832
Chantilly, VA 20153-0832

Case 0:04-8an-80017-UA   Document 3   Filed 05/02/2005   Page 13 of 20

DCN: 5500000034583228
Process Date: 08/17/2004
Page: 2  of  3

http://www.npdb-hipdb.com

Professional School(s) & Year(s) of Graduation: SUNY DOWNSTATE MEDICAL CENTER 1962

Occupation/Field of Licensure (Code): PHYSICIAN (MD) (010)

State License Number, State of Licensure: G-8825, CA

Other, as Specified:

Specialty: UNSPECIFIED (99)

Drug Enforcement Administration (DEA) Numbers:

Unique Physician Identification Numbers (UPIN):

Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.):

Business Address of Affiliate:

City, State, ZIP:
Country:
Nature of Relationship(s):
Other, as Specified:

## C. INFORMATION REPORTED

Type of Adverse Action: STATE LICENSURE

Name of Agency or Program that Took the Adverse Action Specified in This Report: MEDICAL BOARD OF CALIFORNIA

Adverse Action Classification Code(s): EXTENSION OF PREVIOUS ACTION (1296)

Other, as Specified:

Date Action Was Taken: 06/21/2004

Date Action Became Effective: 06/28/2004

Length of Action: INDEFINITE

Years:
Months:
Days:

Total Amount of Monetary Penalty, Assessment and/or Restitution:

Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: NO

Description of Act(s) or Omission(s) or Other Reasons for Action Taken: SURRENDER OF LICENSE.  ACTION BASED ON UNPROFESSIONAL CONDUCT.

Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of the Patient?: YES

CONFIDENTIAL DOCUMENT -- FOR AUTHORIZED USE ONLY

# STATE OF NEW YORK
## DEPARTMENT OF HEALTH

433 River Street, Suite 303     Troy, New York 12180-2299

Antonia C. Novello, M.D., M.P.H., Dr. P.H.
*Commissioner*

Dennis P. Whalen
*Executive Deputy Commissioner*

August 2, 2004

Theodore Sabot, M.D.
24 Jones Avenue
Chatham, NY  01237

RE: ARB Order No. 04 - 101

Dear Dr. Sabot:

You have been served with Determination and Order No. 04-101 of the Professional Medical Conduct Administrative Review Board. This Order imposes penalties of a five year suspension of your medical license (stayed) and a ten year period of probation with practice monitoring. Enclosed you will find information about practice monitoring.

New York State Public Health Law requires that you notify the Department within 30 days of any changes in your Physician Profile information. Your compliance with the terms of this Order will be monitored by this office. Please complete the enclosed Data Sheet and submit your proposal for a practice monitor to:

> Michael Babala
> N.Y.S. Department of Health
> Office of Professional Medical Conduct
> 433 River Street, Suite 303
> Troy, NY 12180

I would encourage you to call your Case Coordinator, Mr. Babala directly at (518) 402-0845, to schedule a meeting and to answer any questions. Thank you for your anticipated cooperation.

Sincerely,

Nathan P. Reed, M.D.
Medical Director
Physician Monitoring Programs
Office of Professional Medical Conduct

Enclosures

ADDENDUM 4

BP-S148.055   **INMATE REQUEST TO STAFF** CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Dr. Ramirez | DATE: April 16, 2003 |
| FROM: Theodore Sabot | REGISTER NO.: 11556-052 |
| WORK ASSIGNMENT: A & O | UNIT: MB |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

I saw you about 3 times in the last month, the most recent about 10-14 days ago. The first 2 times was after an episode of orthostatic hypotension, when I suddenly keeled over backwards, briefly losing consciousness. Because of that, you decreased the metoprolol from 50mg p.o. b.i.d. to 25mg b.i.d. You had also increased my enteric-coated aspirin from 81 mg p.o. qd to 325 mg qd, which is the dose I had been taking since 1969 and was the minimal dose my cardiologist wanted me on (you have the records). Actually, my loss of consciousness was likely due to the changes, against my protests, in a very stable medication regimen that I had been on for several years, with absolutely no side-effects and good results: my lipid profile had greatly improved (as attested to by lab tests done when I first arrived here) since I had been on lipitor, 40 mg p.o. qd (which you changed to zocor, 40 mg), and my cardiac picture had stabilized on a variety of medications (some of which, as niacin and

[OVER]

(Do not write below this line)

DISPOSITION:

Please sign for sick call if you have medical problems.

RECEIVED AND REVIEWED
APR 1 6 2003
RAMIREZ, M.D., CLINICAL DIRECTOR
FPC SEYMOUR JOHNSON

Signature Staff Member            Date

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

folic acid, you decided not to continue), including toprol XL, 100 mg p.o. qam; accupril, 10 mg p.o. qam, and imdur 30 mg p.o. qam. (Several years ago, my initial coronary angiogram showed partial blockage of at least two vessels, as well as complete occlusion of a branch of a posterior artery, suggesting a silent myocardial infarction in the last decade — and, since on these medications, there has been no progress in the coronary artery disease.)

On 4/8/03 I submitted, as per FPC routine, a request, dated 4/9/03, for refills of all my medications. Later that day, I went to the pill line to get another refill form, and the person there told me that, to my surprise, there were some medications for me: Lisinopril, 10 mg qam, E-C Aspirin, 81 mg p.o. qd, and metoprolol, 25 mg p.o. qam (not the b.i.d. dosage you had told me). I then checked with Mr. Lowery, who told me my medications would all be renewed, as per my request and based on the doses decided when I last saw you. I had brought him the empty bottles (or vials) of the zocor and the 325 mg ASA. He told me to check back on 4/15, as he had re-sent the renewals to Butner. When I checked back yesterday, I was told by nurse Johnson that I would be getting no more medications, as you had discontinued the zocor and reduced the ASA, again, to 81 mg (barely a pediatric dose).

I request that: ① the zocor be resumed (at 40 mg po qPM), as my elevated lipid profile has done very well on it, including reducing the chances of progression of my coronary artery disease and ② my enteric-coated aspirin dose be restored to 325 mg, as per my cardiologist and the American Heart Association guidelines.

Moreover, because of persistent medical problems, I also request I be removed from those required to work.

Please sign for

[signature]

RECEIVED AND REVIEWED
APR 16 2003
M. RAMIREZ, M.D., CLINICAL DIRECTOR
FPC SEYMOUR JOHNSON

ADDENDUM 5

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Associate Warden Rappold | DATE: May 14, 2003 |
| FROM: Theodore Sabot | REGISTER NO.: 11556-052 |
| WORK ASSIGNMENT: Compound | UNIT: MB |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

Please see attached description of my ongoing medical problems and my request to be assigned to medically unassigned status. Included are copies of related correspondence of the last month. Thank you.

→ Mr. Anker

→ 6/16/03 - NOTE As of this I have not received a written reply form the Warden or the Associate Warden

Ted Sabot

(Do not write below this line)

DISPOSITION:

Signature Staff Member                    Date

Record Copy - File; Copy - Inmate
This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

[Addendum to Memo on 5/14/03 to Associate Warden]

On 4/16/03, I wrote to Dr. Ramirez requesting he restore my medications to what they had been, especially because of the persisting side-effects and my concern that the stability of the progress in stopping the worsening of my heart condition be undone. He replied [see attached document] by, in essence, ignoring what I wrote — though I had already seen him 3 times in less than 3 weeks — and said that if I had medical problems, I should go to sick call. I arranged to see him next Tuesday, 4/22, but, as appears the pattern, he was out and my appointment cancelled — making one wonder how appropriate care can be delivered if the M.D. is not here on a regular basis. I was then re-scheduled to see Dr. Guzman, who would be in the next week. Dr. Guzman saw me on April 30th and, though not putting me back on the medication regimen I had been on for some time [I had brought a report from my cardiologist when I arrived here on March 11th] and which had successfully stabilized my coronary artery disease, at least restored the medication to, apparently, as much as could be expected from Health Services here. This included re-starting one medication Dr. Ramirez had, for some inexplicable reason, stopped and increasing the dose and frequency of another to what Dr. Ramirez told me he would prescribe but apparently forgot.

I also discussed my medical problems in some detail with Dr. Guzman and asked if I could be given a pass indicating I couldn't work because of medical reasons. He said I would need to contact Dr. Ramirez, as only he could transfer me to medically unassigned status. So, I wrote to Dr. Ramirez on 5/1, hand-delivering the request to health services but, as of today, 5/14, I have not received a reply [see attached handwritten copy of request, as I did not keep a copy of the actual form].

(OVER)

I should also mention an enlightening experience I had on 5/1. Having just then been assigned to temporary status, I went to sign out at Base Detail. There, the lieutenant asked if I could do some work. Describing my persistent medical problems, I said I was concerned about falling again, even losing consciousness. The lieutenant said to me - and I accurately paraphrase - that, since I'd be working on grass, it would cushion any fall! And the C.O. with him added that he hoped I would do my best to keep myself alive until I got home! Unbelievable, but not surprising, as it seems in keeping with the quality of care and concern I have experienced here.

Given all the stalling and delays, I am writing you, Associate Warden, trusting that you can expedite the resolution of my request to be transferred to medically unassigned status.

Thanking you in advance, I await your written reply,

*[signature]*

[Detailed addendum to cop-outs sent to appropriate staff at this facility.]
[Copy of memo sent to Health Services/Assoc. Warden]

I am very concerned about the appropriateness and quality of the medical care I am receiving here. Since I have serious coronary artery disease, incorrect treatment can be a matter of life and death. [Also, please see detailed "cop-out" I hand-delivered on 4/16/03 to Dr. Ramirez, with no reply received.] Heart disease was diagnosed several years ago and a treatment regimen was worked out by my cardiologist in Albany, N.Y., in consultation with an internationally-known cardiologist at the Cleveland Clinic. Over the last 2-3 years, it has succeeded — as tests have shown — in stopping the progress of the blockages in my coronary vessels.

I brought a summary of this treatment to the health services but Dr. Ramirez, for his own inscrutable reasons and despite my protests, has seen fit to make significant changes in my medications. Moreover, after seeing him for the third time and being told he would at least not further interfere with the established medication regimen, he promptly discontinued one important medication and reduced the dosage on two others. Nor was my confidence bolstered by the fact that, though having seen me three times in the space of about ten days, he had at the last meeting confused me with another patient.

The first two meetings were necessitated by side-effects caused by the medication changes he made, as I had never had any side-effects on my established regimen. The worst one was an episode of loss of consciousness on Saturday, March 29th, at morning stand-up count (I won't go into details now of how inadequately this crisis was handled). I literally keeled over backwards like a felled tree, striking my head, neck, shoulder and coccyx on the hard floor. Since then, I have had persistent after-effects, which health services has minimized or cavalierly ignored, despite the fact that this was the first time in my life any such episode has occurred.

Considering the potentially grave consequences of the inadequate treatment I have so far received, I respectfully request that

(cont)